# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CASE NO. 3:07-cr-264-C

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) |
| | ) |
| SERGIO VASQUEZ-LOZANO | ) |
| | ) |

**THIS MATTER** is before the Court on the defendant's motion to suppress evidence seized on February 2, 2007 searches of his home. (Doc. No. 14).

The defendant was indicted on November 15, 2007, on charges of being an illegal alien in violation of 8 U.S.C. § 1325(a) and for knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(5). The defendant filed a Motion to Suppress Evidence on February 1, 2008, arguing therein that the evidence obtained from his house was seized in violation of his Fourth, Fifth, and Sixth Amendment rights. Specifically, he argues that all evidence obtained from the house should be excluded from trial because: the immigration officers did not have consent to search and enter the residence; if consent was given, it was thereafter revoked; the search exceeded the scope of any alleged consent; and the firearm was not found in plain view.

This Court held a suppression hearing on March 4, 2008, where it heard, *inter alia*, the testimony of Officer Jack Denton, Agent Edwin Ziegler, Officer Bill Haines, and the defendant's brother, Carlos Vasquez-Lozano. After hearing the evidence, the Court took the case under advisement. For the reasons that follow, the defendant's motion is denied.

# I. FINDINGS OF FACT

Based on the testimony and evidence received, and the Court's credibility determinations after observing the various witnesses testify, the Court makes the following findings of fact:

On November 2, 2007, Officer Denton, Supervisory Immigration Enforcement Agent Ziegler, Supervisory Deportation Officer R.K. Williams and Deportation Officer Dave Goble arrived at 10924 Kingfisher Road in Charlotte, North Carolina, around 5:00 in the morning. The officers were looking to serve an administrative warrant on a fugitive alien, Ivan Ortega-Lozano, believed to be living at the residence on Kingfisher Road.

When the officers arrived, they encountered Lucio Lozano-Ensaldo, who was getting in his car to go to work. Officer Denton approached Lucio, identified himself, and asked Lucio if he knew Ivan. According to Officer Denton, Lucio said that he did not know Ivan and that Ivan did not live at the residence. Officer Denton then asked, "Can we look?" and Lucio said, "Yes."[1] After Lucio gave consent to search, Officer Denton motioned with his hand and told Lucio to show the officers into the residence. Lucio led the officers down the driveway to the back door of the residence. Lucio thereafter entered the residence followed by the four officers.

Once inside the residence, the officers swept the house looking for Ivan and herding the other members of the household, including the defendant, downstairs to the living room. The officers asked them for identification and accompanied them back to their bedrooms to get it. At one point, Agent Ziegler was escorting a male upstairs to get his identification. Before he let the male enter the bedroom, he conducted a protective sweep of the room. While looking in the closet, Agent Ziegler saw a shotgun leaning against the wall. Agent Ziegler testified that he could see the foregrip of the shotgun sticking out and leaning against the wall and that it was not covered up. He testified that

---

[1] The encounter was conducted in Spanish.

he was able to see the shotgun as soon as he opened the closet door. He cleared the weapon and brought it back downstairs to Officer Denton.

Officer Denton asked who the shotgun belonged to and the defendant stated that it was his shotgun. The officers determined that three of the individuals in the residence were illegally in the country and took them into custody. While in custody and having waived his Miranda rights, the defendant admitted to purchasing the shotgun and illegally entering the United States.

## II. LEGAL FRAMEWORK

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment generally prohibits the warrantless entry of a person's home unless voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1974). Since the officers did not have a warrant to search the residence at 10924 Kingfisher Drive, the search of the residence was lawful only if the officers had consent to the search from a co-occupant.[2]

### A. CONSENT

It is well settled that the Government "must shoulder the burden of proving that an individual freely and intelligently gave . . . unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." United States v. Morrow, 731 F.2d 233, 235-36 (4th Cir. 1984) (internal quotation marks and alteration omitted). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S.

---

[2] The Government does not assert that any other exception to the warrant requirement is applicable to this case.

at 227. "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996).

Officer Denton testified that Lucio said that they could look for Ivan in the residence and then proceeded to lead the officers into the back door of the residence.[3] While the consent following the question, "Can we look?" is arguably vague, Lucio's action of leading the officers into the back door of the residence demonstrated unequivocal consent to the search. See United States v. Jones, 356 F.3d 529, 534 (4th Cir. 2004) ("Consent may be supplied by non-verbal conduct as well."). In viewing the totality of the circumstances, coupling Lucio's positive answer to the question of whether the officers could look for Ivan and his action of leading the officers into the residence leads this Court to conclude that Lucio gave consent voluntarily and unequivocally.[4]

The defendant argued that Lucio did not give consent to search the residence. The defendant submitted a video at the hearing showing an interview of Lucio wherein he denied giving consent. The Court does not find this evidence credible. Lucio, who had previously been deported and was once again in the country illegally, was not willing to come into court and be placed under oath. Additionally, his recantation was the product of limited questions and was not subject to cross-examination. The officers, however, came into court and were sworn and subject to cross-examination. The Court was able to evaluate their demeanor, and the consistency of each of their

---

[3] Agent Ziegler was not close enough to overhear the conversation between Officer Denton and Lucio, but he testified credibly that Lucio led the agents down the driveway to the backdoor and into the residence.

[4] There was no allegation that Lucio's consent was the product of duress or coercion.

testimony with the other. The court concludes that on the essential points material to the issue of consent, their testimony was credible.

The defendant's next argument with respect to consent is that any putative consent became invalid when another member of the household revoked consent to search. The defendant asserts that immediately upon entry into the residence, the officers learned that Lucio had no authority to consent to the search and were told by the daughter of the owner that they had no consent. See Georgia v. Randolph, 547 U.S. 103, 120 (2006) ("We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").

The only evidence of this alleged revocation of consent came from the testimony of Carlos Vasquez-Lozano, the defendant's brother. Carlos testified that when the officers gathered everyone in the living room, his sister asked who gave the officers permission to enter and why they had entered the house. Even if the Court were to accept this account as true, these questions do not amount to an express revocation of consent.

However, Officer Denton and Agent Ziegler both testified to the contrary that no one asked them to leave and all of the occupants were cooperative. The Court finds Officer Denton and Agent Ziegler's testimony more credible and therefore is compelled to conclude that consent to search the residence was not revoked.

As to the defendant's second argument regarding Lucio's authority to consent, there is no indication that Lucio did not have authority to consent to a search as a co-occupant of the residence. See Illinois v. Rodriguez, 497 U.S. 177, 188 (1990) ("As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective

standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" (internal quotation marks omitted)). Lucio was discovered leaving the residence at 5:00 in the morning and approaching a car parked on the street in front of the residence. When the officers approached, he gave consent and led the officers up the driveway to the backdoor of the residence where he entered. It was completely reasonable for the officers to believe that Lucio was an occupant of the residence being present so early in the morning and offering to lead the officers to the back door. This Court finds that under the circumstances the officers reasonably relied on Lucio's authority to give consent. The defendant has provided no evidence that the consent was revoked by any of the people present at the time of the search. Accordingly, the search of the residence was constitutionally permissible and did not result in a violation of the defendant's Fourth Amendment rights.

## B. SCOPE OF CONSENT

As noted above, the officers had consent from a co-occupant to search the residence for Ivan. Since the consent was neither revoked nor tailored in scope, the officers could lawfully search places in the residence where Ivan could be hiding. See Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."). The defendant asserts that Agent Ziegler's search of the closet was beyond the scope of the consent. "The scope of a search is generally defined by its expressed object." Id. at 251. In this case, Lucio's voluntary and unequivocal consent to search the residence not only permitted the officers to enter the bedrooms but also necessarily gave them license to search the closets where Ivan could be hiding. See id. at 252 (recognizing that general consent authorizes the search of any area that may contain the object of the search and officers are not required to repeatedly return for consent to search specific

containers found in the placed searched). Thus, Agent Ziegler's search of the closet was well within the scope of Lucio's consent.

The defendant also contends that Agent Ziegler should have relied on the previous sweep by another agent of the room and should not have re-checked the closet. The Court rejects this assertion. The Court finds that even though the room had been initially searched by another officer during the course of a protective sweep, this does not mean that the officers had only one shot. Not only did Agent Ziegler have consent, he prudently re-checked the closet for his own safety before allowing a potential suspect into the bedroom to get identification. This Court recognizes the value of double-checking. Certainly the he exclusionary rule's deterrent rationale is not promoted by limiting law enforcement to one security check.

### C. PLAIN VIEW

Since the officers had consent to search, it follows that the shotgun found in the closet is not subject to suppression. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Arizona v. Hicks, 480 U.S. 321, 326 (1987). Under this doctrine, officers may seize an object without a warrant if (1) the object is actually in plain view; (2) the officers are lawfully located in a place from which the object can be plainly seen; (3) the object's incriminating character is immediately apparent; and (4) the officers have a lawful right of access to the object. See United States v. Legg, 18 F.3d 240, 242 (4th Cir. 1994).

Agent Ziegler testified that he found the shotgun in the closet leaning against the wall. He credibly stated that he could tell it was a shotgun because he could see the foregrip of the shotgun sticking out and leaning at an angle with the barrel. Agent Ziegler testified that the shotgun was in plain view and was easily viewed from the doorway of the closet. Carlos, however, testified that the shotgun was in his closet covered by a shirt. In evaluating the credibility of these two witnesses, the

Court finds Agent Ziegler's testimony more credible as to whether the shotgun was in plain view. Since the shotgun was found in plain sight and the officers were lawfully in the residence, the defendant's constitutional rights have not been violated and the shotgun should not be suppressed.

### III. CONCLUSION

For the reasons stated above, the defendant's Motion to Suppress Evidence is **DENIED**.

Signed: March 19, 2008

Robert J. Conrad, Jr.
Chief United States District Judge